RULEY, JUDGE:
This is what commonly is called a changed condition claim, growing out of a highway construction contract. Under the contract, dated October 13, 1971, claimant agreed to construct 23,073 linear feet of Appalachian Corridor Highway, in Nicholas County, for the sum of $4,025,247.70. The original completion date of July 31, 1973, was extended to October 12, 1974, and the actual completion date was November 15, 1974. By supplemental agreements dated August 22, 1972, and January 10, 1975, the contract price was increased $779,700 for 226,000 cubic yards of rock borrow excavation. The original amount of this claim was $1,835,814.91 but, at the trial, the claimant withdrew three items,Of the claim totalling $84,071.28, leaving a claim in the sum of $1,751,743.63.
*55 The claim is based upon the following provisions of Specification 104.2, Standard Specifications Roads and Bridges, Adopted 1968:
“104.2 — Alteration of Plans or Character of Work:
* * * *
Should the Contractor encounter or the Commission discover during the progress of the work subsurface or latent physical conditions at the site differing materially from those indicated in the contract, or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract, the Engineer shall be notified in writing of such conditions; and if the Engineer finds the conditions do materially differ and cause an increase or decrease in the cost of, or the time required for performance of the contract, an equitable adjustment will be made and the contract modified in writing accordingly.”
In gist, claimant contends that it encountered “subsurface * * * conditions at the site differing materially from those indicated in the contract” and that it is entitled to an “equitable adjustment” of the contract. As in virtually all highway construction projects in this state, this one involved a series of cuts and fills. The more specific contention of the claimant is that the respondent’s plans showed that the cuts contained more than a sufficient supply of hard stone which could be utilized in the fills when, in fact, they contained virtually no stone which was satisfactory for that purpose. For that reason, claimant was obliged to obtain the stone from other, more remote places and was obliged to waste the cut material rather than utilize it in the fills. This misfortune naturally resulted in several ramifications including various delays which, in turn, naturally involved increased costs.
The preponderance of the evidence demonstrates that the claimant did encounter subsurface conditions “differing materially from those indicated in the contract” as illustrated by a letter dated January 29, 1973, over the signature of L.G. Wickline, respondent’s assistant district engineer, in which he stated:
“As indicated in the attached letter, the plans did show a surplus of select rock within the project excavation limits. This rock was not available, and the contractor had to borrow the material off the right of way in *56 order to complete the embankment.” (emphasis supplied)
And, in view of other correspondence between the parties, the respondent cannot be heard to say that it did not receive, or timely receive, the written notice “of such conditions” for which provision is made in Section 104.2. In fact, it appears that supplemental agreements 3 and 6 were equitable adjustments and were made pursuant to that section. By letter dated July 7, 1972, claimant requested compensation for 120,000 cubic yards of rock “from an outside source” (the exact amount authorized by supplemental agreement 3). Other correspondence from the claimant to the respondent related to the reasons for delays (responsive to which, apparently, the completion date of July 31, 1973, was extended to October 12, 1974) and to changes in cut slopes.
At no time, however, until claimant’s letter to respondent dated May 7, 1975, which apparently was written in response to respondent’s letter of April 23, 1975, notifying claimant that it would be assessed liquidated damages of $8,100.00 for 27 days delay from October 12, 1974 to November 15, 1974, was there any written notice whatever to the respondent to the effect that the claimant expected to receive additional compensation for other additional work or expense attributable to the difference in subsurface conditions. In that letter, claimant states:
“As you know, the time extension granted to us was, for the most part, because of the excessive number of days lost to inclement weather during the life of the Project. It should be understood, however, that the inclement weather alone was not the main reason for this excessive loss of working time; but rather, it was the detrimental subsurface soils and water conditions which differed materially from those indicated on the original bid drawings in combination with the inclement weather that caused us to require nearly 15 extra months to complete the Contract. More specifically, when we bid this Project, the plan core borings and plan quantity sheets indicated that there would be a considerable amount of medium rock and hard rock encountered in the excavation cuts throughout the Project. These boring and quantity sheets were completely erroneous since we encountered practically no rock at all. As a result, our excavation and grading operations became mired and bogged down in the mud every time it rained (and for *57 several days afterwards) rather than our being able to operate on the hard surface of rock cuts and being able to haul over rock surfaced haul roads, regardless of rain or not, as we had planned.
Furthermore, excessive underground water conditions, which were not provided for in the original Contract design, caused us to undercut our roadways and our drainage lines to a far greater degree than had been anticipated. These underground water conditions also worstened (sic.) the unstable condition of the cut areas during construction.
As a result of these differing conditions, we were required to use methods of construction different than planned on, re-do work previously completed, perform extra work at no additional pay, all of which resulted in the inefficient use of our men, equipment, and project management for a much longer time than originally contemplated.
We have discussed these items with you from time to time during the length of the Project, as well as other related items of extra cost, without resolution. Since the final estimate represents our last chance to obtain payment under the Contract for the financial hardship that we suffered, we would appreciate an opportunity to meet with you, or with your Charleston office, to discuss deletion of liquidated damages and to arrive at an equitable adjustment in the final estimate for these additional costs.”
Specification 105.17 provides, in part:
“105.17 — Claims for Adjustment and Disputes:
If, in any case, the Contractor deems that additional compensation is due him for work or material not clearly covered in the Contract or not ordered by the Engineer as extra work, as defined herein, the Contractor shall notify the Engineer in writing of his intention to make claim for such additional compensation before he begins the work on which he bases the claim. If such notification is not given, and the Engineer is not afforded proper facilities by the Contractor for keeping strict account of actual cost as required, then the Contractor hereby agrees to waive any claim for such additional compensation. * * *”
*58 It was the specification which was the basis of the comment by Judge Wallace in A. J. Baltes, Inc. v. Department of Highways, 13 Ct.Cl. 1, at 3 (1979), where he stated:
“According to the Standard Specifications, and under the terms of the contract, the claimant was required to give the Engineer written notice that it intended to make claim for additional compensation in the form of an equitable adjustment due to differing site conditions. The contract further provides that such notice shall be given before work is commenced in the claimed area so that the Engineer is afforded the opportunity for keeping strict account of the actual cost. Failure to comply with this provision under the contract is to be considered a waiver by the claimant or contractor of any claim for additional compensation.”
In Baltes, the claimant gave such written notice approximately two months after the materially different condition was encountered, providing the basis for the Court’s conclusion there that, as soon as it became apparent that a substantial changed condition existed, the notice of intention to claim additional compensation was given. In this case, there is no such basis for such conclusion. It hardly needs be said that, when the respondent received claimant’s letter of May 7, 1975 (almost six months after the contract was completed), it was impossible for respondent’s engineer to keep “strict account of actual cost”. In fact, it appears from the evidence that the claimant itself did not keep an account of actual cost incurred as a result of the changed condition.
Whether the respondent had timely actual notice of claimant’s intention to make a claim for the additional work which is the subject of this claim and, by its conduct, waived the written notice requirement ■'f Specification 105.17 does not appear from the evidence thus far duced. For that reason, the Court is disposed to grant a motion to reopen this claim for the purpose of hearing evidence on those subjects, provided such motion is filed within 30 days after this opinion is issued.